ISMAEL G. SANTILLANES, Appellant, v. THE
STATE OF NEVADA, Respondent.

No. 16276

February 21, 1986                          714 P.2d 184

*H. Leon Simon,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Robert J. Miller,* District Attorney, and *James N. Tufteland,* Deputy District Attorney, Clark County, for Respondent.

_____

[4]THE HONORABLE CLIFF YOUNG, Justice, did not participate in the disposition of this appeal.

## OPINION

*Per Curiam:*

Appellant Ismael Santillanes was arrested and charged with first degree murder with use of a deadly weapon. A jury found Santillanes guilty. Santillanes was sentenced to two consecutive life sentences with the possibility of parole. For the reasons set forth below, we conclude that the district court committed prejudicial errors. We reverse and remand for a new trial.

## THE FACTS

On January 22, 1984, at 8:20 a.m., Pamela Leavitt was found dead in her apartment. Pamela Leavitt had died as the result of a stab wound in the chest.

The appellant, Ismael Santillanes, and Bruce Bennett shared the apartment above Leavitt. At trial, Santillanes testified that at approximately 3:00 a.m., while he was sitting alone in his apartment watching T.V., he heard footsteps outside his apartment and the breaking of a window. Upon investigation he saw a person with a flashlight walking away and noticed that one of Leavitt's windows was broken. Santillanes went to Leavitt's apartment and asked Leavitt what had happened. Santillanes and Leavitt called the police. The police arrived and found a window broken, the door to Leavitt's apartment pushed in and one of the locks broken. At the police's request Santillanes brought a hammer and tape from his apartment which he gave to Leavitt so that she could repair the broken window. The police left at approximately 3:30 a.m. Santillanes testified that he left Leavitt's apartment soon thereafter, and returned to his apartment. He testified that he did not hear anything else for the rest of the night except dogs barking.

The next morning Santillanes left his apartment to attend church. When Santillanes returned to his apartment, the police informed him of Leavitt's murder. Pursuant to a consent search, the police searched the Santillanes-Bennett apartment and confiscated a penlight, a pair of green fatigue pants and a white towel. All of the items had small spatterings of blood on them. The fatigue pants belonged to Santillanes and were found in his bedroom. Bennett testified that the blood on the towel was his as a result of a shaving accident. An expert witness testified that he was not able to identify the blood on the penlight other than it was human and not animal blood. Blood tests revealed that both Santillanes and Leavitt were blood type O. Further testing of the enzymes and proteins in their blood and the blood stains found on the fatigue pants revealed that the blood on the fatigue pants could not have originated from Santillanes but could have originated from Leavitt.

Upon request by the police, Santillanes agreed to go to the police station and give a statement. At the police station, Santillanes consented to give a blood and hair sample and to take a polygraph test at a later date.

At trial, witnesses testified that no foreign human hairs were found on Leavitt's body. No hairs from Leavitt were found upstairs in the Santillanes-Bennett apartment. Neither of the shoe prints taken from and around Leavitt's apartment was made by shoes confiscated from Santillanes' apartment. Latent fingerprints taken from the Leavitt apartment did not match any of the prints from Leavitt, Santillanes, Bennett and various police officers who had been in the apartment.

On January 31, 1984, Santillanes left Las Vegas prior to taking the polygraph test. He went to Mexico and upon re-entry into the United States was arrested for desertion from the Air Force.

At trial the district court admitted, over objection, testimony surrounding Santillanes' failure to take the polygraph test to show Santillanes' consciousness of guilt.

### THE EVIDENCE OF FAILURE TO TAKE
### A POLYGRAPH TEST

Santillanes contends that the admission of the evidence that he failed to take a polygraph test was prejudicial, constitutional error which mandates a reversal of the conviction. We agree.

On January 22, 1984, the day of Leavitt's murder, Santillanes did agree to take a polygraph test. On January 24, 1984, Santillanes spoke with a police detective. The test was scheduled for January 26, 1984. On January 25, 1984, Santillanes again spoke with the detective and informed the detective that he wanted to consult with a counselor at Nellis Air Force Base before taking the polygraph test. The detective told him that he should not talk to the legal counsel on the Base. Santillanes left Las Vegas on January 31, 1984.

Evidence of the results of a polygraph test is admissible if both parties have signed a written stipulation to that effect. Aguilar v. State, 98 Nev. 18, 639 P.2d 533 (1982). In the absence of such a stipulation, polygraph evidence is inadmissible to impeach or corroborate the testimony of a witness. Corbett v. State, 94 Nev. 643, 584 P.2d 704 (1978).

The prevailing rule is that proof that a defendant in a criminal trial either refused to take a polygraph test or offered to submit to one is inadmissible and incompetent evidence. State v. Biddle, 599 S.W.2d 182 (Mo. 1980); State v. McDavitt, 297 A.2d 849 (N.J. 1972); *see generally,* 95 A.L.R.2d 819 for a discussion of cases which have considered this matter.

As the court in State v. Driver, 183 A.2d 655 (N.J. 1962) stated:

> If the results of polygraph examinations are not competent evidence, *a fortiori,* refusal by a defendant in a criminal case to submit to one cannot be made the subject of testimony. In terms of degree of prejudice, the average jury, unfamiliar with the present scientific uncertainty of the tests, might very well be even more affected by proof of a defendant's refusal to take the test than by the evidence of results adverse to him coupled with proof of its scientific imperfection.

In the instant case the State contends that Santillanes' unwillingness to undergo the polygraph test was relevant because it tends to establish Santillanes' consciousness of guilt. We do not agree.

In People v. Carter, 312 P.2d 665 (Cal. 1957), the court said an accused may refuse to take a polygraph test, not because he fears that it will reveal consciousness of guilt, but because it may record as a lie what is in fact the truth.

Disclosure of a murder suspect's refusal to take a polygraph test, evidence of which refusal was admitted on the theory that it tended to show a consciousness of guilt, was held in Mills v. People, 339 P.2d 998 (Colo. 1959) to constitute prejudicial error. The Colorado court noting that the defendant's conviction relied only upon circumstantial evidence (as in the instant case) held that the erroneous admission of evidence of the defendant's refusal to undergo a polygraph test might well be sufficient to tip the scales against him and that such refusal is not equivalent to evidence of consciousness of guilt.

In the case at bar Santillanes, by pretrial motion, unsuccessfully objected to the introduction of evidence surrounding his failure to take the polygraph test. And in his argument to the jury the prosecutor stated:

> If he [Santillanes] is innocent, what is the first thing he wants to do. Go get the polygraph just as quick as he can. But if his state of mind is that of a guilty man . . .

We conclude that the admission of Santillanes' failure to take the polygraph test and the prosecutor's comments thereon constituted prejudicial error.[1] We therefore reverse and remand the case to the district court for a new trial.

---

[1] We have considered appellant's remaining assignments of error and find them meritless.