ISMAEL G. SANTILLANES, Appellant, *v.* THE
STATE OF NEVADA, Respondent.

No. 17747

December 21, 1988                              765 P.2d 1147

*Brian H. Breedlove,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland,* Deputy, Clark County, for Respondent.

## OPINION

By the Court, Gunderson, C. J.:

This case has previously come before this court on appeal. The facts are reported in Santillanes v. State, 102 Nev. 48, 714 P.2d 184 (1986). In *Santillanes,* we concluded that "the admission of

Santillanes' failure to take [a] polygraph test and the prosecutor's comments thereon constituted prejudicial error." *Id.* at 51, 714 P.2d at 187 (footnote omitted). We therefore reversed the prior judgment of the district court and remanded the case for a new trial. *Id.* On remand, a jury once again convicted Santillanes of first degree murder with the use of a deadly weapon. This appeal followed. We now affirm the district court's judgment of conviction.

1. In *Santillanes,* we focused on the inadmissibility of polygraph evidence,[1] and the likelihood that a jury might be prejudiced even more by a defendant's refusal to submit to testing "than by the evidence of results adverse to him coupled with proof of [the test's] scientific imperfection." *Id.* at 51, 714 P.2d at 186 (quoting State v. Driver, 38 N.J. 255, 183 A.2d 655 (1962)). In keeping with our decision in the matter, the prosecution at Santillanes' retrial omitted any reference to the polygraph test. Instead, the prosecution referred to Santillanes' failure to attend two "meetings" with the police to which Santillanes had voluntarily agreed. In the prosecution's view, failure to attend the meetings constituted evidence of flight and, when considered with Santillanes' subsequent absence without official leave from the Air Force, exhibited Santillanes' consciousness of guilt.

Santillanes contends, however, that between the time he initially cooperated with the police by providing a statement—at which time the police informed him of his *Miranda* rights—and the scheduled meetings, he decided to assert his right to remain silent. According to Santillanes, the prosecution's references to the aborted meetings were impermissible comments on his right to remain silent, and, thus, violations of the due process clause of the fourteenth amendment to the United States Constitution. In support of his argument, Santillanes primarily relies on Doyle v. Ohio, 426 U.S. 610 (1976).

Initially, we note that the facts of this case are readily distinguishable from those presented in *Doyle*. The defendants in *Doyle* did not waive their *Miranda* rights nor did they voluntarily agree to meet and discuss their case with the police as did Santillanes. Concerns of fundamental fairness present in *Doyle*—that a defendant, having been informed of his right to remain silent, should have his silence later used against him—are not present here. *See* United States v. Mitchell, 558 F.2d 1332 (8th Cir. 1977) (testimony about defendant's silence admissible where

---

[1]The results of a polygraph test are inadmissible unless both parties have agreed otherwise by a signed, written stipulation. *Santillanes,* 102 Nev. at 50, 714 P.2d at 186 (citing Aguilar v. State, 98 Nev. 18, 639 P.2d 533 (1982)).

defendant waived *Miranda* rights, provided an exculpatory statement to police, and, when faced with evidence contradicting his statement, remained silent).

More importantly, we are not convinced that the prosecutor's references to Santillanes' failure to attend the meetings were comments on Santillanes' silence. In consenting to meet with the police, subsequently cancelling the meeting by telephone, and later agreeing to another meeting just prior to fleeing to Mexico, Santillanes was anything but silent. Rather, the prosecutor's references to the aborted meetings were specific examples of Santillanes' conduct. From this conduct, as well as from Santillanes' flight to Mexico, the jury could reasonably infer Santillanes' consciousness of guilt. While the prosecutor's comments may have suggested to the jury that Santillanes did not wish to talk further with the police, the jury could have inferred as much from Santillanes' flight to Mexico. Maresca v. State, 103 Nev. 669, 748 P.2d 3 (1987). We conclude, therefore, that evidence of the aborted meetings was properly admitted as evidence of flight, and that the prosecutor did not improperly comment on Santillanes' silence.

2.  Santillanes next contends that the district court erred in allowing testimony about his absence without official leave from the Air Force. In Santillanes' view, the testimony constituted evidence of an uncharged crime and was more prejudicial than probative.

Other criminal acts of a defendant are admissible if substantially relevant and if not offered for the purpose of showing the likelihood that he committed the act of which he is accused in conformity with a trait of character. Williams v. State, 95 Nev. 830, 833, 603 P.2d 694, 696 (1979) (citation omitted); NRS 48.045(2). *See* Williams v. State, 85 Nev. 169, 451 P.2d 848 (1969) (all circumstances of flight may be shown including offenses committed during flight). In addition, for evidence of other criminal acts to be admissible its probative value must outweigh any prejudicial effect. *Williams,* 95 Nev. at 833, 603 P.2d at 696 (citation omitted); NRS 48.035(1).

We believe that Santillanes' decision to absent himself from his military post and to face the penalties associated therewith was substantially relevant as further evidence of flight. Indeed, much of the probative value of the flight evidence is supplied by Santillanes' decision to leave his post. By choosing such a penalty laden course, he strengthened the inference of his consciousness of guilt. The record on appeal discloses that the district court carefully weighed the probative value of this evidence against its

possible prejudicial effect. We are not convinced that the district court's decision was manifestly wrong and thus will not disturb it on appeal. Daly v. State, 99 Nev. 564, 567, 665 P.2d 798, 801 (1983).

3. As his third assignment of error Santillanes contends that the prosecutor, Mr. Seaton, committed forensic misconduct by expressing his personal belief in Santillanes' guilt.[2] Appellant argues that Mr. Seaton's comments were so inherently prejudicial that they precluded appellant from receiving a fair trial. We agree that Mr. Seaton's remarks were improper; however, we do not believe a reversal is warranted in this case.

It is a prosecutor's right to "state fully his views as to what the evidence shows." State v. Green, 81 Nev. 173, 176, 400 P.2d 766, 767 (1965) (citation omitted). Statements of personal opinion as to the defendant's guilt, however, are improper. Yates v. State, 103 Nev. 200, 734 P.2d 1252 (1987).

In making the comments set forth in the margin, Mr. Seaton distinctly traversed the boundary separating proper from

---

[2] In support of his contention, Santillanes cites the following:

MR. SEATON: Now, to get down to the interesting question, who-dunit? That's what we are here about. That is what Mr. Handfuss is going to talk to you about. And I am going to spend the rest of my time going over the factors that lead me—and the evidence—to believe that Mr. Santillanes over there is the person who killed Pamela Leavitt.

MR. HANDFUSS: Excuse me. I object. I am sorry, counsel, but may we approach the bench?

THE COURT: Yes.

(Discussion at the bench which was not reported.)

MR. SEATON: Is there no objection, Mr. Handfuss?

MR. HANDFUSS: In that case, there is no objection, Mr. Seaton.

MR. SEATON: Okay.

Well, let me explain what just went on. Doggonit! You people shouldn't be kept in the dark.

I think I said to you—and if I didn't, I am going to say it now. I said to you that the evidence or the things that lead me to believe from the evidence that Mr. Santillanes committed the crime—well, I am not allowed to give you my opinion. Let me say that right here and now. You don't—don't any of you be swayed by my opinion just simply because it is my opinion.

You may be swayed by what you heard up here on this stand and everything that is sitting over there on that table. That's the evidence in this case.

And if I said the wrong thing, Mr. Handfuss, I apologize.

But anything I say to you it is based on only that which I have heard, the same evidence that you have heard. And so that is what I am talking from.

But I continue to state that I believe the evidence has shown us that Mr. Santillanes is indeed guilty of this crime.

improper argument. His initial statement certainly had the tenor of an expression of personal belief in Santillanes' guilt. Then, following an objection from the defense counsel, and after Mr. Seaton apparently promised the court at side-bar that he would himself correct his misbehavior, Mr. Seaton went on quite clearly to insinuate his beliefs into the record again. We do not condone such conduct, and we hereby direct the District Attorney of Clark County to take whatever administrative action may be necessary to assure that Mr. Seaton's prosecutorial misconduct, so frequently repeated heretofore, does not again recur.

Nonetheless, while we conclude that Mr. Seaton's aforesaid comments were improper, we do not believe they require reversal in this case. We note that Mr. Seaton's later comments did not draw a further objection from defense counsel and, while they continued improperly to suggest Mr. Seaton's personal beliefs, they at least correctly informed the jury that such beliefs were not evidence and should not be relied upon.

4. Santillanes also challenges the district court's decision to admit the results of a serological electrophoresis test. The State's expert, Brian Wraxall, developed the test in question, Multi-System electrophoresis analysis (Multi-System), to permit the identification of several blood enzyme and protein types from a single dried blood sample. Mr. Wraxall employed his process in this case to test bloodstains found on a pair of fatigue pants that police recovered from appellant's apartment. He concluded that while the stain on the fatigues was inconsistent with Santillanes' blood, it was consistent with that of the victim. Santillanes argues that the Multi-System has not received general acceptance in the scientific community, and that it was error to admit the results.

Preliminarily, we note that other courts that have considered the admissibility of Multi-System test results have arrived at differing conclusions. *Cf.* People v. Young, 425 Mich. 470, 391 N.W.2d 270 (1986) (prosecution failed to establish scientific community's general acceptance of Multi-System's reliability) *with* State v. Washington, 229 Kan. 47, 622 P.2d 986 (1981) (sufficient evidence of reliability and acceptance by scientific community presented to admit expert testimony about test results).

In Warden v. Lischko, 90 Nev. 221, 224, 523 P.2d 6, 8 (1970) we rejected the evidentiary use of narco-interrogation and the polygraph because neither "method ha[d] received court recognition as possessing the trustworthiness and reliability needed to accord the [test's] results the status of competent evidence." *Id.* (citation omitted). We relied on *Lischko* in American Elevator Co. v. Briscoe, 93 Nev. 665, 572 P.2d 534 (1977), where we

decided that a polygraph examiner did not fall within the testimony-by-experts statute, NRS 50.275, because polygraph evidence had not received "general scientific acceptance." *Id.* at 671, 572 P.2d at 538.

Our use of the phrase "general scientific acceptance" in *Briscoe* was not intended to signal the adoption of a special test for the admission of scientific evidence.[3] As evidenced by our reliance on *Lischko,* our intention in *Briscoe* was, and it continues to be, to assess the admissibility of scientific evidence, like other evidence, in terms of its trustworthiness and reliability.[4] With this in mind, we turn to whether the district court erred in admitting the results of Mr. Wraxall's Multi-System test.

Prior to permitting Mr. Wraxall to testify about the test results, the district court conducted an evidentiary hearing out of the jury's presence. There, Mr. Wraxall testified regarding the Multi-System's methodology and the safeguards he observes in conducting tests. He testified that he, as well as others whom he had instructed in the method, had verified the accuracy of the method in blind trials.[5] In addition, the district court inquired of Mr. Wraxall regarding the possibility of test error induced by the blood sample's age or possible contamination. Counsel for the defense extensively cross-examined Mr. Wraxall.[6] At the conclusion of the evidentiary hearing, the district court found the testing procedures to be sufficiently credible to permit the introduction of the test results.[7]

---

[3]The phrase "general scientific acceptance," as well as the notion of a special test for the admission of scientific evidence, finds its origin in Frye v. United States, 293 F. 1013 (D.C.Cir. 1923). In the sixty-five years since *Frye* was decided we have neither cited to nor adopted the decision.

[4]Of course, scientific evidence must also meet the other standards for admissibility such as relevancy and probativeness. *See* NRS 48.025; NRS 48.035.

[5]Mr. Wraxall testified that in over 1100 blind trials only two errors occurred. While independent testing would certainly bolster the test's appearance of reliability, we do not believe that Mr. Wraxall's pride of invention or financial interest in the process fatally flaws his results. *Cf. Young, supra,* 391 N.W.2d at 275-77 *with Young, supra,* 391 N.W.2d at 289-99 (Boyle, J., dissenting). Such matters affect the credibility of testimony and are thus for the jury's determination.

[6]We note that defense counsel did not call his own experts to testify nor was he obliged to. In establishing the trustworthiness and reliability of the method, the burden rested solely with the prosecution, the proponent of the evidence, to establish the method's admissibility by the necessary quantum of evidence. The defense bears no burden whatsoever on this issue.

[7]Judge Mosley also found that the Multi-System analysis was generally accepted in the forensic community. This determination, while adding great weight to the conclusion that the test is trustworthy and reliable, is not necessary for admission of the evidence.

From our review of the testimony presented at both the evidentiary hearing and at the trial, we believe that there was sufficient evidence presented concerning the test's trustworthiness and reliability to permit the test results to be presented to the jury. In addition, we conclude that the evidence met the normal standards of admissibility in that it was relevant, its probative value outweighed any possible prejudicial effect, and it was neither misleading, confusing, nor unduly consumptive of judicial time. *See* NRS 48.025; NRS 48.035. The weight to be afforded the evidence was for the jury's determination. Deeds v. State, 97 Nev. 216, 626 P.2d 271 (1981). Accordingly, we conclude that, on this record, the district court did not err in admitting the Multi-System test results. This conclusion, however, does not constitute a finding that the test must hereafter be found reliable, regardless of what proofs are made to appear to another court hereafter. Of course, in future cases, defense counsel will remain entitled to challenge the test based on proofs they may be able to adduce concerning it, and courts will remain free to make their own judgments in regard thereto.

We have carefully reviewed appellant's other assignments of error and find them to be without merit. The judgment of conviction is affirmed.

STEFFEN, YOUNG, SPRINGER, and MOWBRAY, JJ., concur.