JOHN ALLEN SMITH, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 24600

JOHN ALLEN SMITH, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 24601

April 27, 1995                              894 P.2d 974

[Rehearing denied October 19, 1995]

*David Schieck,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, *James Tufteland,* Chief Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, SPRINGER, J.:

Defendant John Allen Smith (Smith) was convicted, pursuant to a jury verdict, of eight counts of incest involving his oldest daughter (the adult-victim) and two counts of sexual assault with a minor under fourteen years of age and one count of child abuse and neglect with substantial mental injury. Both the sexual assault and child abuse and neglect charges involved Smith's younger daughter (the child-victim). The charges involving the adult-victim were raised in a separate information than those involving the child-victim. The two cases were consolidated for trial on February 19, 1992.

On appeal, Smith raises two assignments of error that we conclude have merit: (1) that his Sixth Amendment right to confront the witnesses against him was violated when the prosecutor during the direct examination of the child-victim positioned himself such that the child-victim could not view Smith, and, conversely, completely obstructed Smith's view of the child-victim; and (2) that the district court erroneously admitted the testimony of Sanity Commission doctors. We conclude that the admission of the Sanity Commission doctors' testimony, while erroneous, was harmless. The violation of Smith's Sixth Amendment right, however, cannot be considered harmless with respect to the sexual assault and child abuse and neglect charges. Accordingly, we affirm Smith's conviction on the incest charges, reverse Smith's conviction on the sexual assault, child abuse and child neglect charges and remand the sexual assault and child abuse and neglect charges to the trial court for a new trial.

### CONFRONTATION CLAUSE CHALLENGE

During the prosecutor's direct examination of the child-victim, the prosecutor intentionally positioned himself such that he blocked the victim's view of Smith and, conversely, completely obstructed Smith's view of the victim.[1] Smith claims that this

---

[1] The prosecutor did step out of the way at the point in his direct examination when the child-victim identified Smith as her assailant.

tactic violated his Sixth Amendment right to confront the witnesses against him. We agree.

The Sixth Amendment to the United States Constitution gives a criminal defendant the right to confront the witnesses against him or her. The United States Supreme Court addressed the issue of a defendant's right to confront his child accuser in a sexual assault case in Coy v. Iowa, 487 U.S. 1012 (1987). In that case the Supreme Court stated, "We have never doubted . . . that the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Id.* at 1016. In *Coy,* a screen was placed between the defendant and the child sexual assault victims during their testimony. This screen blocked the defendant from the child witnesses' view but allowed the defendant to hear and dimly perceive the children. The court in *Coy* stated, "It is difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter." *Id.* at 1020.

The State argues that this case is distinguishable from *Coy.* While there are obvious distinctions between *Coy* and the facts of this case, we conclude that they do not render *Coy* inapplicable. First, we discern no cognizable distinction between the placement of a screen between a defendant and the witness against him or her as was done in *Coy,* and the prosecutor's intentional positioning of his or her body such that the witness' view of the defendant is completely obscured as occurred in this case. Indeed, in *Coy* the defendant was able to see the witnesses, if only "dimly." *See id.* at 1015. Here, Smith could not see the witness at all.

In addition, the fact that the prosecutor was seated and the child-victim's view of the defendant unobstructed during her cross-examination does not, as the State argues, fulfill the constitutional mandate of face-to-face confrontation. The United States Supreme Court has held that the relevant inquiry in determining whether a defendant's Sixth Amendment right to confront witnesses against him or her has been infringed upon is whether the alleged violation of that right interfered with the defendant's opportunity for effective cross-examination. Kentucky v. Stincer, 482 U.S. 730, 740 (1986). While Smith had the unfettered opportunity to cross-examine the child-victim, we do not believe he could do so *effectively* under the circumstances of this case. "It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' In the former context, even if a lie is told, it will often be told less convincingly." *Coy,* 487 U.S. at 1019. If a child witness is permitted to testify on direct examination "behind the defendant's back," so to speak, and does so credibly,

the damage has already been done; it would be very difficult to impeach or discredit that testimony on cross-examination. As the defense aptly puts it, cross-examination of a child witness in a sexual assault case is akin to dancing a "tango in a mine field." Instead, the likely result is that defense counsel will alienate the jury against him or her and the defendant.

The trial court stated that "it's difficult enough for adults to look another individual in the face and accuse [him or her] of serious misconduct or of a crime. It's additionally difficult, exceedingly difficult for a nine-year old girl to look her father in the face and so accuse him." This is undoubtedly true. However, while "face-to-face presence may, unfortunately, upset the truthful rape victim or abused child . . . by the same token it may confound and undo the false accuser or reveal the child coached by a malevolent adult. It is a truism that constitutional protections have cost." *Id.* at 1020.

In summary, we hold that the prosecutor's shielding of the child-victim with his body during direct examination denied Smith his constitutional right to a face-to-face confrontation and interfered with his ability to cross-examine effectively the child-victim.[2] We must now assess whether this violation can be considered harmless.

While the United States Supreme Court has suggested that the denial of a face-to-face confrontation in violation of the Sixth Amendment may be subject to a harmless error analysis, it has also indicated that an "assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." *Id.* at 1021-22. Assessing the remaining evidence in this case, we cannot say that the denial of Smith's right to confront the child-victim was harmless. The only other evidence, besides the child-victim's testimony, the State presented supporting its case on the sexual assault and child abuse and neglect charges was the testimony of a former friend of Smith's who testified that while Smith was

---

[2]The prosecution made no offer of proof that the child-victim would be traumatized or otherwise affected by having an unobstructed view of Smith during direct examination and the district court made no specific finding regarding this issue. Accordingly, we do not reach the issue left open by the United States Supreme Court in *Coy* of whether an exception to the constitutional mandate of a face-to-face confrontation exists when a trial court makes a case specific, individualized determination that such a confrontation would traumatize the witness at issue. *See Coy,* 487 U.S. at 1020-21.

visiting him Smith insisted on sleeping in the same bed with the child-victim, even though a bed was available in another room, and the testimony of Dr. Paul G. Webb, a school psychologist who examined the child-victim and concluded that her "mental condition and behavior was consistent with a victim of child sexual assault." Although Dr. Webb gave very detailed and extensive testimony supporting this conclusion, we cannot say that "it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty" absent the testimony of the child-victim. United States v. Hasting, 461 U.S. 499, 511 (1983). Accordingly, we must reverse Smith's conviction of the sexual assault and child abuse and neglect charges.[3]

## SANITY COMMISSION TESTIMONY

The first three witnesses called by the State were Dr. Richard Taylor, Dr. Roger Agre, and Dr. Charles Mac Van Valkenburg, who examined Smith to determine whether he was competent to stand trial. All three doctors testified that in their opinion Smith was "malingering" which Dr. Taylor described as the "intentional description of signs and symptoms that the individual knows are not accurate but [with] which the individual hopes to attain some sort of goal"—e.g., when a child pretends he or she has the flu on a day he or she has a test in order to avoid taking the test. In this case, Smith claimed to have suffered a severe head trauma which precluded his remembering many details. He also claimed he was unable to place himself in the proper time and place and did not know who he was. After reviewing Smith's medical records and neurological work-ups, each doctor concluded that there was no indication of head trauma. In addition, during each doctor's interview with Smith, it became clear that Smith in fact was oriented to time and place and knew who he was. Each doctor reached his diagnosis of malingering independently of the other doctors' diagnoses.

In addition to the testimony regarding malingering, Dr. Taylor, who is a psychiatrist licensed to practice in Nevada, testified that Smith suffered from an anti-social personality disorder. Dr. Taylor described this disorder as "a personality in which the individual lacks what we would call in lay terms a conscience." Dr. Taylor then went on to further describe anti-social personality disorders as follows:

---

[3]We note that the child-victim also testified that she had observed her father and the adult-victim "humping" on one occasion. As discussed below, the evidence the State presented in support of the incest charges was overwhelming; we thus conclude that, with respect to the incest conviction, this testimony was harmless.

Personality disordered people, and there are 12 types of personality disorders, are people who are usually defined most adequately as people who manage to get under our skin in some way. Anti-social people can be mildly anti-social, and usually one sees them in used .car lots—that's a perfect example, selling used cars. And at the very extreme levels, these are people that hopefully you will never see and they're on the back wards of the state hospitals where they have committed and will commit and can commit the most violent of crimes without a second thought, without a bit of conscience.

Dr. Taylor did not testify as to the severity of Smith's anti-social personality disorder.

Neither Dr. Agre nor Dr. Van Valkenburg testified regarding a personality disorder. Dr. Van Valkenburg, however, testified that he diagnosed Smith as having an alcohol dependence and a narcotics dependence in remission.

These doctors' testimony was patently inadmissible. The State asserts that the doctors' testimony is analogous to evidence of flight from the scene of the crime or to evade apprehension by the authorities, and correctly points out that this court has permitted the admission of "flight" evidence to demonstrate "consciousness of guilt or wrongful conduct." *See* Turner v. State, 98 Nev. 103, 107, 641 P.2d 1062, 1064 (1982); *see also* Santillanes v. State, 104 Nev. 699 (1988). In this case, the State claims Smith attempted to convince the Sanity Commission doctors that he was incompetent to stand trial by "malingering" in order to avoid having to proceed to trial. According to the State, "[a]ttempting to avoid trial and the inevitable judgment of one's actions is tantamount to fleeing the scene of a crime and is therefore relevant to the proceedings as evidence of consciousness of guilt."

We agree that Smith's malingering could be construed as "consciousness of guilt." However, as Smith suggests, if the reasoning of the State is carried further, then evidence that a defendant filed a motion to suppress his or her confession should be admitted as well. In other words, the State, under its rationale, would be able to tell a jury "the defendant tried to beat this case on a technicality instead of wanting to go to trial. This is evidence of consciousness of guilt." Obviously, this is inappropriate.

Further, and more importantly, the State's argument fails to take into account a defendant's Fifth Amendment rights. There was no evidence presented that the doctors in question advised Smith that any statement he made would be admissible in court

and that by submitting to a competency examination he was waiving his right against self-incrimination by answering the *State-employed* doctors' questions or that they advised him that they could be called to testify against him.

Finally, the State fails altogether to address the fact that Dr. Van Valkenburg testified that he diagnosed Smith as having an alcohol dependence and a narcotics dependence in remission and that Dr. Taylor diagnosed Smith as having an "anti-social personality disorder" and likened him to a used car dealer at best or someone who belonged on the back wards of a mental hospital at worst because he could "commit the most violent of crimes without a second thought, without a bit of conscience." This testimony was clearly inadmissible character evidence. *See* NRS 48.045(2).

Although we conclude that the Sanity Commission doctors' testimony should have been excluded from evidence, we hold that the admission of this evidence is harmless with respect to Smith's conviction on the incest charges.[4] The considerations relevant to deciding whether error is harmless or prejudicial include whether the issue of innocence or guilt is close, the quantity and character of the error and the gravity of the crime charged. Big Pond v. State, 101 Nev. 1, 692 P.2d 525 (1985). The evidence presented in support of the incest charges was overwhelming. The adult-victim's testimony was very compelling and was supported by other witnesses. Two friends of Smith testified. One testified that Smith bragged about the adult-victim's sexual prowess. Another testified that Smith had admitted to him that he and the adult-victim were living together as husband and wife and that they had a sexual relationship. This same individual also testified that Smith had warned him that "there would be consequences" if he ever disclosed that Smith had made this admission. In light of this evidence, we conclude that while the crimes at issue are "grave" and the "quantity and character" of the error is not small, " 'it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty' " on the incest charges notwithstanding the erroneous admission of the Sanity Commission doctors' testimony. Weathers v. State, 105 Nev. 199, 202, 772 P.2d 1294, 1297 (1989); Big Pond v. State, 101 Nev. 1, 692 P.2d 525 (1985). Accordingly, we affirm Smith's incest conviction.

---

[4]We need not assess the impact of the evidence on Smith's conviction of sexual assault and child abuse and neglect as we conclude that these convictions must be reversed as a result of the Confrontation Clause violation discussed above.

## CONCLUSION

For the foregoing reasons, we affirm Smith's conviction of the eight counts of incest involving the adult-victim and reverse his conviction and remand for a new trial on the remaining counts.[5]

YOUNG and ROSE, JJ., concur.

STEFFEN, C. J., with whom SHEARING, J., joins, concurring in part and dissenting in part:

I concur with the majority's affirmance of Smith's convictions on eight counts of incest (Case No. 24600), but strongly disagree with the majority's reversal of Smith's convictions of two counts of sexual assault with a minor under the age of fourteen years, two counts of attempt sexual assault with a minor under the age of fourteen years, and one count of child abuse and neglect with substantial mental injury (Case No. 24601),[1] and therefore dissent with respect to the latter case. In view of my concurrence with the result in Case No. 24600, the remainder of this opinion will relate solely to my dissent in Case No. 24601.

Unquestionably, courts must be vigilant in protecting the vitality of the highly important Sixth Amendment right of an accused to confront the witnesses against him. The search for truth in criminal trials demands nothing less in respecting this nation's primal aversion to conviction of the innocent. But courts can engage in such sophisticated extensions and nuances of the right that they actually undermine its purposes and generate deleterious consequences. I am fearful of such consequences in these extremely challenging and tragic child sexual abuse cases. Innocent parents or guardians may elect not to report the ravaging of their children because of the multiple traumas and ordeals inflicted on the children by the criminal justice system over the course of trying to bring their tormentors to justice.

In the instant case, I suggest that the majority has provided

---

[5]Smith raised two additional issues in his appeal that are not addressed in this opinion. We have considered these assignments of error and conclude that they lack merit.

[1]The verdict entered under Count IV of the Information erroneously finds Smith guilty of Sexual Assault with a Minor Under 14 Years of Age as set forth in Count IV of the Information. Count IV of the Information charges Smith with Attempt Sexual Assault with a Minor Under 14 Years of Age. The judgment entered by the court is thus inconsistent with the jury's written verdict as to Count IV, although it is consistent with the Information. Given the fact that the judgment entered against Smith was of the lesser charge of Attempt Sexual Assault, the judgment should stand despite the above-noted inconsistency.

Smith with relief never contemplated under the Sixth Amendment. Moreover, quite tragically and unnecessarily, an innocent child will be subjected to the harrowing travails of a second trial or perhaps the State will be forced into the position of providing Smith with an advantageous plea bargain in order to avoid further suffering and victimization of the child.

The overriding issue before us is whether Smith was meaningfully deprived of his Sixth Amendment right to confront his accuser. For the following reasons, I answer the question in the negative.

A meaningful analysis of the issue must commence with a full recital of the operative facts. At the time of trial, the child-victim was nine years of age. During her direct examination by the State, the prosecutor positioned himself between the child-victim and her father, Smith, so that neither the child nor the accused could see one another except when the prosecutor stepped aside to have the child-victim look directly at Smith and identify him. She did so by pointing to her father, indicating the color of his shirt and stating "He's the old guy over there." This direct confrontation between the child-victim and the father who had tormented her was briefly noted by the majority in a footnote that provided no detail. I suggest that it is a significant part of the meaningful Sixth Amendment right of confrontation that Smith received at trial.

After the child-victim's testimony on direct examination, the prosecutor took his seat, and defense counsel thereafter cross-examined the victim in the full and unimpeded view of Smith. The majority concludes, however, that the cross-examination could not have been effective because it is easier to lie without looking the subject of the lies in the face. Conceding the point, I note, however, that my own experience as a trial attorney demonstrated that it was always easier to expose a lie after a witness had expressed it as truth on the stand. A fresh and conscious awareness of having lied in order to injure a defendant, plaintiff, or witness, is frequently a difficult fact to conceal. I suggest that the difficulty would be compounded in the mind of a nine-year-old child who is providing testimony that could place her own father in prison. In any event, one need not conjecture on the comparative advantages or disadvantages of a child possibly testifying untruthfully because of the lessened trauma facilitated by the prosecutor's screening, and then possibly being more traumatized by suddenly facing her own father under conditions of cross-examination while trying to cling to lies that could send him to prison.

My review of the record reveals an intelligent, probing cross-examination of the child-victim by defense counsel. His methodology was sensitive to the age of the witness, yet effective in

searching for indications of inconsistency or falsehood. As an example, I quote from a small segment of the cross-examination:

Q. Now, do you recall a time when you were taken—taken to a doctor, a woman doctor for an examination?
A. Uh, yes.
Q. Do you recall telling the doctor things about your dad?
A. I believe so.
Q. Did you tell the doctor the same thing that you're telling us today?
A. Yes, I am.
Q. Now, do you ever recall telling anyone that your dad had humped you, using the word "hump"?
A. Uh, I do not think I did.
Q. Okay. Do you ever recall seeing Sis [this refers to Smith's then adult daughter who was the subject of his convictions for incest] and your dad humping?
A. Yes.
Q. And where was that?
A. It was in the trailer.
Q. Okay. And was your dad humping Sis the same way he was trying to hump you?
A. Uh, yes.
Q. Now, your dad never put his penis or his private part inside your private part, did he?
A. He did try.
Q. Okay. Your dad never put your private—his private part in your bottom, did he?
A. No. I mean, he tried but he couldn't get it in.

The majority has reversed Smith's convictions of sexual assault on his then seven-year-old daughter because Smith was assertedly denied his meaningful right to confront her. I strongly disagree and do not believe that the law as announced by the United States Supreme Court either supports or requires the majority's ruling.

The majority relies primarily on the United States Supreme Court opinion in Coy v. Iowa, 487 U.S. 1012 (1988), as support for its ruling. I suggest that there is a vast chasm between *Coy* and the instant case. First, it should be noted that *Coy* was only a plurality ruling insofar as it may be interpreted to imply an absolute constitutional right of face-to-face confrontation.[2] In

[2]Indeed, four of the justices in *Coy* noted the obvious proposition that exceptions to the hearsay rule represent a notable deviation from the notion that the constitutional right of confrontation is absolute. It is difficult for me to understand how excited utterances, reputation evidence, business records, etc. that avoid the confrontational requirement could possibly be viewed as more inherently truthful than the testimony of a child who is subjected to full, face-to-face cross-examination at trial in full view of the defendant and the

*Coy,* the child witnesses were prevented from seeing the defendant by the placement of a screen between the witnesses and the defendant. The defendant, however, was able to hear and dimly see the witnesses. The majority stresses that in *Coy* the defendant could dimly see the child witnesses, whereas the prosecutor blocked Smith's view of the witness entirely. Lost in that equation is the critical difference that the defendant in *Coy* never did have a face-to-face confrontation with the child witnesses, whereas Smith had direct visual access to his daughter briefly during her direct examination and throughout the period of her cross-examination.

The more recent majority ruling of the High Court in Maryland v. Craig, 497 U.S. 836 (1990), provides greater and more comprehensive enlightenment on the issue. In *Craig,* a Maryland statute was invoked that provided for a procedure in certain cases where a child witness is insulated from the courtroom and the defendant. Yet, the *Craig* Court found it significant that:

> Maryland's procedure preserves all of the other elements of the confrontation right: The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies.

*Id.* at 851. I note, parenthetically, that although Smith was not able to witness the child-victim's demeanor during all but the identification segment of her testimony under direct examination, he was able to do so during contemporaneous cross-examination. Moreover, unlike *Craig,* where the child-witness never came face-to-face with the defendant, Smith had extensive direct exposure to the child-victim, her testimony, and her demeanor.

---

jury. Moreover, the "omnibus" exception to the hearsay rule based upon circumstantial guarantees of trustworthiness and the co-conspirator assertion represent other deviations from the right of confrontation that appear patently less susceptible to an analysis of truthfulness than a child testifying before the judge and jury under the circumstances of the instant case. Finally, as noted by Justice O'Connor in her concurring opinion in *Coy,* "the Court has time and again stated that the [Confrontation] Clause 'reflects a *preference* for face-to-face confrontation at trial,' and expressly recognized that this preference may be overcome in a particular case if close examination of 'competing interests' so warrants." *Coy,* 487 U.S. at 1024 (quoting Ohio v. Roberts, 448 U.S. 56, 63-64 (1980)) (emphasis added in *Coy*). Cited also by Justice O'Connor was the Court's ruling in Chambers v. Mississippi, 410 U.S. 284, 295 (1973) ("Of course, the right to confront . . . is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."). If protecting child victims from unnecessary trauma in the courtroom is not a legitimate interest of society and the judiciary, then I suggest that both need to rethink their priorities.

Continuing with a rather extensive segment of the opinion in *Craig,* the Court moves to the heart of the matter as follows:

> Although we are mindful of the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding, the presence of these other elements of confrontation—oath, cross-examination, and observation of the witness' demeanor—adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony. These safeguards of reliability and adversariness render the use of such a procedure a far cry from the undisputed prohibition of the Confrontation Clause: trial by *ex parte* affidavit or inquisition, see *Mattox,* 156 U.S., at 242; see also *Green,* 399 U.S., at 179 (Harlan, J., concurring) ("[T]he Confrontation Clause was meant to constitutionalize a barrier against flagrant abuses, trials by anonymous accusers, and absentee witnesses"). Rather, we think these elements of effective confrontation not only permit a defendant to "confound and undo the false accuser, or reveal the child coached by a malevolent adult," *Coy,* [487 U.S.] at 1020, but may well aid a defendant in eliciting favorable testimony from the child witness. Indeed, to the extent the child witness' testimony may be said to be technically given out of court (though we do not so hold), these assurances of reliability and adversariness are far greater than those required for admission of hearsay testimony under the Confrontation Clause.

*Id.*

I consider it helpful to further quote at length from the Court's analysis in *Craig* of the substantive purpose and requirements of the Confrontation Clause:

> The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. The word "confront," after all, also means a clashing of forces or ideas, thus carrying with it the notion of adversariness. As we noted in our earliest case interpreting the Clause:
>
> > "The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face

with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox,* [v. United States, 156 U.S. 237, 242-43 (1895)].

As this description indicates, the right guaranteed by the Confrontation Clause includes not only a "personal examination," [*Mattox,*] 156 U.S., at 242, but also "(1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." [California v. Green, 399 U.S. 149, 158 (1970)].

The combined effect of these elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings. See [Kentucky v. Stincer, 482 U.S. 730, 739 (1987)] ("[T]he right to confrontation is a functional one for the purpose of promoting reliability in a criminal trial"); *Dutton v. Evans,* 400 U.S. 74, 89 (1970) (plurality opinion) ("[T]he mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the [testimony]'"); *Lee v. Illinois,* 476 U.S. 530, 540 (1986) (confrontation guarantee serves "symbolic goals" and "promotes reliability"); . . . .

*Id.* at 845-846.

I have burdened this dissent with unusually extensive quotes from *Craig* because I am convinced that when the substance of the material quoted is analyzed, it will be seen that Smith received a full measure of adversariness in conformity with the purpose and demands of the Confrontation Clause. In short, the complex of factors present and available to Smith included: (1) personal examination; (2) testimony by the child under oath; (3) vigorous cross-examination of the child; and (4) the full opportunity for the jury to observe the child's demeanor and to evaluate her credibility.

To be sure, the Court in *Craig* recognized that the accuracy of the fact-finding aspect of trial may be enhanced by face-to-face confrontation between the accused and the accuser, and that such confrontation "forms 'the core of the values furthered by the Confrontation Clause,'" *id.* at 847 (quoting *Green,* 399 U.S. at 157), but the Court nevertheless recognized that face-to-face confrontation was not the *sine qua non* of the Clause. *Id.* Given the factors noted above, the fact that Smith was in his daughter's physical presence throughout the trial, and in direct visual contact with her during the probing, contemporaneous cross-examination, justifies the procedure allowed by the trial judge and satisfies the requisites of the Sixth Amendment confrontation right. Indeed, when the High Court recognized that the form of testimony and procedure utilized in *Craig* constituted a far greater assurance of reliability and adversariness than hearsay exceptions, then *a fortiori,* the form of procedure and testimony utilized here carries greater assurances of accuracy and truth than any exception to the hearsay rule that would have justified hearsay in direct diminution of the Confrontation Clause.

Although I am of the opinion that the procedure utilized in the instant case, without more, satisfied the Confrontational Clause, the *Craig* Court, in recognizing the compelling and transcendent interest of the States in protecting the welfare of children, and the growing body of academic literature attesting to the psychological trauma inflicted on child sex abuse victims as they testify in court, *id.* at 855, nevertheless held that the State would have to present a showing of necessity where a child witness is allowed to testify against a defendant at trial without confronting the defendant face-to-face. *Id.* Despite the fact that Smith had an extended and meaningful opportunity to confront the child-victim face-to-face in the instant case, I will nevertheless address the showing of necessity that was also demonstrated and impliedly deemed to be sufficient by the district court.

The Maryland Court of Appeals in the appeal from the defendant Craig's conviction, reversed on grounds that before the trial court could allow the child-witnesses to testify via one-way closed circuit television, the statutory requisites for such a procedure had to be satisfied. Craig v. Maryland, 560 A.2d 1120 (1989). In particular, the Maryland Court of Appeals held, and the Court in *Craig* agreed, that

> as a prerequisite to use of the [one-way television] procedure, the Confrontation Clause requires the trial court to make a specific finding that testimony by the child in the courtroom *in the presence of the defendant* would result in the child suffering serious emotional distress such that the child could not reasonably communicate.

*Craig,* 497 U.S. at 858. The Supreme Court proceeded to note, however, that the Maryland Court of Appeals interpreted the *Coy* decision to impose two additional requirements: (1) that the child witness be initially questioned in the presence of the defendant; and (2) that the trial judge determine whether the child would suffer "severe emotional distress" if required to testify by two-way closed circuit television. *Id.* The Maryland Court of Appeals noted that the trial judge only had the benefit of expert testimony on the ability of the children to testify; he questioned none of the children and failed to observe any child's behavior on the witness stand before making his ruling. *Id.* at 859. The *Craig* Court declined "to establish, as a matter of federal constitutional law, any such categorical evidentiary prerequisites for the use of the one-way television procedure." *Id.* at 860. Finally, the Court concluded that the trial judge "could well have found, on the basis of the expert testimony before it, that testimony by the child witnesses in the courtroom in the defendant's presence 'will result in [each] child suffering serious emotional distress such that the child cannot reasonably communicate. . . .'" (Citing relevant Maryland statutory provision.)

In the instant case, the school psychologist, Dr. Paul Webb, who had interviewed both the child-victim and the older daughter with whom Smith had committed incest, testified that both had told him that Smith was very abusive physically, and used excessive physical punishment. He also testified that the child-victim reported physical threats from Smith and that she gave in to his sexual demands out of fear of physical abuse or severe punishment. Moreover, Dr. Webb noted that the child-victim told him of her nightmares involving someone eating her and wrestlers who would come and kidnap her. Dr. Webb testified that the child's nightmare about being eaten could relate to her reports of Smith "sucking on her privates," and that sexually abused children who have nightmares will frequently have nightmares about being killed or kidnapped. Moreover, the judge heard the child-victim's real mother, who "married" Smith at age fifteen, testify about Smith's extremely violent behavior with her, involving not only physical beatings, but threats with guns, which he fired close to her head, and with knives. She testified that she was "scared" of Smith. Finally, the older daughter who had long been sexually abused by Smith, also testified that he was violent and that she feared for her own safety as well as the child-victim's. While crying, defendant's adult daughter testified that her own experience with Smith gave her reason to fear that he would sexually touch a young girl. Finally, defendant's adult daughter also testified that she feared her father and would "rather be dead than to go through any more."

The trial judge heard all of the above testimony prior to the time the child-victim testified. In justifying his ruling at the bench that the prosecutor would be allowed to conduct his direct examination of the child-victim by standing between Smith and the child, the trial judge stated two reasons. First, while acknowledging the right to face-to-face confrontation, he did not believe that translated into "eyeball-to-eyeball" confrontation. Second, the judge concluded that it is "exceedingly difficult for a nine-year-old girl to look her father in the face and so accuse him." Although I may not describe the basis for the ruling as the judge did, I suggest that he impliedly concluded that all factors considered, he was at least going to give the child the opportunity to start her testimony on direct examination without having to suffer the intimidation of direct visual contact with Smith. I further suggest that in doing so, he satisfied the showing of necessity announced in *Craig* as sufficient criteria for allowing one-way closed television testimony where the child witness is outside the physical presence and view of the defendant entirely.

Finally, even if I were to conclude—and I most certainly do not—that the trial court erred in permitting the prosecutor to question the child-victim on direct examination as he did, I would find the error harmless beyond a reasonable doubt given the overwhelming evidence against Smith.

Concluding that Smith was fairly tried and convicted on all counts involving both victims, and that additional assignments of error unaddressed by the majority or this dissent are also without merit, I must respectfully dissent from the tragically sad, and in my judgment, unwarranted reversal of Smith's judgment of conviction for his sexual crimes against his seven-year-old daughter.

