WILEY GENE WILSON, AKA JOHN RAYMOND KRUIDE-NIER, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 42437

June 23, 2005 114 P.3d 285

*J. Chip Siegel, Chtd.,* and *Joel Martin Mann* and *Jay L. Siegel,* Las Vegas, for Appellant.

*Brian Sandoval,* Attorney General, Carson City; *David J. Roger,* District Attorney, *James Tufteland,* Chief Deputy District Attorney, and *Craig L. Hendricks,* Deputy District Attorney, Clark County, for Respondent.

Before ROSE, GIBBONS and HARDESTY, JJ.

## OPINION

*Per Curiam:*

While running an errand with the 10-year-old daughter of a family friend, Wiley Gene Wilson stopped at a local Wal-Mart store to buy new clothes for the girl because she had urinated in her pants. Wilson also purchased a Polaroid camera and film. Wilson then took photographs of the girl in various stages of undress and in various

sexually suggestive poses as she changed clothes in the back of his Ford Bronco. The State charged Wilson by indictment with four counts of using a minor in the production of pornography and four counts of possession of a visual presentation depicting sexual conduct of a person under 16 years of age. Following a jury trial, Wilson was convicted on all eight counts and sentenced to four terms of 24 to 72 months on the possession charges to run concurrently with four consecutive terms of life with the possibility of parole after ten years for the production charges. The district court further ordered that all sentences were to run consecutively to any remaining time on the federal prison sentence Wilson was currently serving.

Wilson appeals his conviction arguing that (1) it violates double jeopardy because he was convicted on four counts of production of child pornography arising out of a single incident, (2) it violates double jeopardy because the four charges of possession of child pornography are lesser-included offenses to the four production charges, (3) the district court erred by denying Wilson possession of material evidence (the photographs) against him at trial, (4) the district court violated his Sixth Amendment right to confront his accuser, (5) the district court erred by denying Wilson's motion to dismiss based on the State's alleged failure to meet the 120-day deadline under the Interstate Agreement on Detainers, (6) the district court failed to compel the testimony of material witnesses for the defense, and (7) the indictment failed to adequately advise Wilson of the charges such that he could prepare a defense. We reverse three of Wilson's four convictions for production of child pornography and remand the case to the district court for resentencing as appropriate. However, we conclude that Wilson's remaining arguments on appeal lack merit.

## FACTS

In September of 2001, the victim's father (Keith) moved from Hawaii to Las Vegas along with his ten-year-old daughter (M.T.), his four-year-old son, and a family friend named Faye. Keith was looking for work but was unable to secure employment, and the family was having difficulties making ends meet. Sometime during September, Wilson approached Keith, who was sitting on a park bench eating a sack lunch with his children. Wilson introduced himself as Sean Thomas and asked Keith if he was looking for work. Wilson offered Keith work remodeling his travel trailer and agreed to allow Keith's family to live in the trailer while Keith was doing the remodel work.

On November 15, 2001, Keith was attempting to fix a problem with the satellite dish receiver in the trailer. Wilson took the receiver down to the satellite company to see if they could fix it. The first time he left, Wilson took both of Keith's children with him,

and he was gone for about an hour and a half. Wilson returned to the trailer with a new receiver, but this one also did not work. After calling the satellite company a second time, Wilson decided to return to the satellite company with the new receiver. This time only M.T. accompanied Wilson, and the two of them were gone about 2½ hours. Upon their return, Keith noticed that M.T. was wearing different clothes.

Apparently, on the way to the satellite company Wilson and M.T. were tied up in traffic on the freeway and M.T. urinated on herself, soaking her pants. M.T. testified that after she urinated in her clothing, Wilson took her to Wal-Mart to buy her some new clothes. At the Wal-Mart store Wilson purchased a bathing suit for M.T. along with a Polaroid camera and instant film. M.T. testified that Wilson told her to take her clothes off and that he would take pictures of her. M.T. took off her pants and underwear, and Wilson proceeded to take photographs of her. Wilson told M.T. how to pose in various positions and took additional photographs of her. After Wilson was done taking the pictures, M.T. got dressed in the clothes Wilson purchased for her. M.T. testified that she saw Wilson put the pictures in the glove compartment of his Ford Bronco. Four photographs were taken.

A day or two later, Wilson drove Keith and his two children to the Stardust because Keith had a job interview. On the way home the police pulled Wilson over and arrested him on an outstanding warrant unrelated to the present charge. Keith testified that the arresting officers searched the Bronco but did not look in the glove compartment. Wilson gave Keith the keys to the Bronco, and some officers followed Keith back to the trailer. Once there, Keith locked the truck and the officers took possession of the keys.

About an hour and a half after his arrest, Wilson called Keith and said that his arrest was a mistake. Wilson asked to talk to M.T., and Keith allowed Wilson to talk to his daughter because she was upset. About an hour after Wilson's call, Keith received a second telephone call from Wilson's sister, Virgie Marie Barerra. Sometime after Wilson talked to M.T., she told her father that Wilson had taken pictures of her.

Barerra testified that before calling Keith she received a call from Wilson, who asked her to retrieve some photographs from the glove compartment of his Bronco. Barerra testified that Wilson said the photographs were ''really, really gross'' and asked her not to look at them but to take them home and destroy them. Barerra told Wilson that she thought it was illegal for her to open the Bronco, but he said that because the Bronco was actually registered in her name she was permitted to do what he asked.

Barerra testified that along with her husband, Thomas Barerra, she went over to the trailer where Keith and his two children lived

to retrieve the photographs. The Barerras went out to the Bronco to retrieve the pictures, and Keith went with them. The glove compartment was locked, so Barerra told her husband to break it open with a screwdriver. The three of them removed papers, envelopes, and the vehicle's manual from the glove box. Eventually, they discovered a number of photographs stashed in the manual. The three of them went into the travel trailer and called the Las Vegas Metropolitan Police Department.

When Officer Darrell Rhoads arrived at the trailer he spoke to Keith and Barerra, who gave him consistent accounts of what had occurred that evening. They gave the officer the pictures they found in the glove box. Both Officer Rhoads and Detective Marvel Courtney attempted to talk with M.T. about the pictures, but she was unresponsive. Eventually, Detective Cheryl Hooten, with the sexual assault detail, interviewed M.T., and M.T. told her about the incident. Detective Hooten testified that M.T. told her that after she urinated in her clothing Wilson took her to a Wal-Mart store where he purchased a new camera along with a change of clothes. Hooten further testified that M.T. told Hooten that Wilson instructed her to change clothes and took pictures of her as she did.

Barerra consented to a search of the Bronco, and the police ultimately conducted a search of both the Bronco and the travel trailer pursuant to a warrant. The police found a Polaroid camera inside the center console of the Bronco. On the bathroom floor of the travel trailer the police found a plastic Wal-Mart shopping bag containing clothes with urine on them. In addition, the police recovered a Wal-Mart sales receipt. The receipt, dated November 15, 2001, indicated that the items bought that day included ''a crop bralet, a cover-up, an instant camera, and instant film,'' totaling $51.07.

Detective Courtney contacted Wilson while he was incarcerated at the North Las Vegas Detention Center. Detective Courtney read Wilson his *Miranda*[1] rights, and Wilson signed a waiver acknowledging that he understood them. Wilson admitted to Detective Courtney that he purchased the camera on the same day the pictures were allegedly taken. At one point Wilson called his brother-in-law, Thomas Barerra, and told him that the police had visited him in jail that day, that he had admitted that he took the pictures, and that he needed help. Wilson also admitted to his sister, Virgie Barerra, that he took the pictures and that he was sorry for what he did.

On January 20, 2003, Wilson arrived at the Clark County Detention Center (CCDC) on loan from the federal government through the Interstate Agreement on Detainers (IAD). The State in-

---

[1]*Miranda v. Arizona,* 384 U.S. 436 (1966).

dicted Wilson on four counts of use of a minor in producing pornography and four counts of possession of a visual presentation depicting sexual conduct of a person under 16 years of age. At the time of arraignment, Wilson invoked his right to a speedy trial under the IAD. The court, noting that under the IAD Wilson's trial must begin within 120 days of January 20, 2003, set a trial date for March 20, 2003, and made arrangements to have a public defender appointed to the case.

At the calendar call on March 17, 2003, Wilson's attorney from the public defender's office notified the court that based on the report of a psychologist he believed Wilson was not competent to stand trial. Consequently, Wilson underwent a second psychological evaluation, and on March 26, 2003, the court reviewed the two psychological reports and ordered Wilson committed for further evaluation to determine if he was competent to stand trial. The order of commitment was signed on March 31, 2003. However, on April 9, 2003, the State informed the district court that because the federal authorities considered Wilson an escape risk, the facilities selected for observation were inadequate to house him. The State requested to have Wilson evaluated by its own doctors, and the district court issued an order for a psychiatric examination. As he did on each prior occasion, Wilson objected and expressed concerns to the district court that he was not insane and reiterated his right to a speedy trial under the 120-day requirement of the IAD. The district court explained to Wilson that once his own attorney challenged his competence before the court, the proceedings were tolled and that after the district court could establish his competency the proceedings would continue.

On April 30, 2003, the district court reviewed the psychological report submitted by the State, which concurred with the reports submitted earlier, and stated that Wilson was not competent to stand trial. At the suggestion of both Wilson and the State prosecutor, the district court determined that it should hold a competency hearing to determine whether Wilson was competent to stand trial. On May 16 and 21, 2003, the district court heard testimony from four doctors. Wilson again argued that he was competent to stand trial and filed in open court a motion to dismiss, arguing that the State failed to meet the 120-day deadline under the IAD.

On June 4, 2003, the district court deemed Wilson competent to stand trial. Wilson indicated that pursuant to *Faretta v. California*[2] he would like to represent himself at trial. On June 9, 2003, the district court conducted a full *Faretta* canvass and deemed Wilson competent to represent himself.[3] At that time, the district court ap-

---

[2]422 U.S. 806 (1975).

[3]In Nevada, guidelines for such a canvass are set forth in SCR 253. *See Harris v. State,* 113 Nev. 799, 801-02, 942 P.2d 151, 153-54 (1997).

pointed Jonathan MacArthur as Wilson's standby counsel and Robert Lawson as his investigator. On that date, the district court heard Wilson's motion to dismiss and denied the motion, explaining that because Wilson's own attorneys challenged his competency, the district court was forced to stay the proceedings until his competency was fully evaluated by the court.

On July 7, 2003, Wilson filed a motion for discovery seeking copies of the photographs that were in evidence from the grand jury proceedings. The district court ordered copies of the pictures delivered to Wilson. Two days later on July 9, 2003, Wilson renewed his motion for discovery because the pictures still had not been provided by the State. The State argued that if Wilson took possession of the pictures they would be confiscated as contraband as soon as he returned to the detention center. At the suggestion of Wilson's standby counsel, the district court ordered that copies be made of the pictures and that they be released into the custody of Wilson's standby counsel so that he could review them as necessary.

Wilson brought various motions prior to trial, including a motion for reconsideration of the district court's denial of his motion to dismiss for violating the 120-day requirement under the IAD, a motion to quash the State's motion to permit evidence of prior bad acts, and a motion for forensic testing of the photographs, which was later withdrawn when Wilson was notified that the time required would force him to waive his IAD rights. Wilson also notified the district court that he was having difficulty getting his sister and niece who were living in California to testify on his behalf. The district court told Wilson's investigator to take steps to procure their testimony and to obtain two tickets for the California witnesses' travel.

The trial commenced on July 23, 2003. On that day, prior to jury selection and outside the presence of the jury, the State renewed its objection to Wilson's possession of the photographs through his standby counsel. The district court inquired of standby counsel as to why the defense needed copies of the pictures. Counsel replied that it obtained copies pursuant to a court order issued by Judge Lee A. Gates. Wilson's standby counsel indicated to the district court that the defense no longer had a need to maintain possession of the photographs but argued that the order specifically allowed the defense to maintain possession of the photographs until the end of trial. The district court, finding no compelling reason for the defense to maintain possession of the photographs, ordered counsel to turn them over to the court clerk and ordered that they be available to Wilson through standby counsel as needed at any time.

On July 24, 2003, Wilson notified the district court that he was still having difficulty getting his sister and niece to testify at trial.

Wilson, his investigator, and the State all indicated that they were having trouble contacting the two witnesses. The district court ordered Wilson's investigator and standby counsel to use every means necessary to obtain their attendance, but indicated that the court did not have the power to compel the attendance of individuals residing outside the state.

During trial, Wilson filed a motion for a new trial, arguing that the State violated his right of confrontation when the prosecuting attorney rearranged the courtroom by moving the podium across the room so that M.T. had her back to the defense table while testifying. The district court, interpreting the motion as a motion for a mistrial, denied the motion, noting that M.T. testified in open court, with the defendant present, and that he had ample opportunity to cross-examine the witness on the stand.

On July 29, 2003, the jury returned a verdict of guilty on all eight counts of the indictment. Wilson, through standby counsel, argued that each of the four possession charges constituted a lesser-included offense of the four production charges and should be dismissed. The district court denied the motion, noting that the possession and production charges have separate and distinct elements. The district court sentenced Wilson to four terms of life with the possibility of parole after 10 years for the production of child pornography, each sentence to run consecutively, and four terms of 24 to 72 months on the possession of child pornography charges, to run concurrently to the other charges of the indictment. The district court further ordered that the entire sentence was to run consecutive to any remaining time on the federal sentence Wilson was currently serving.

## DISCUSSION

### Redundant convictions

Wilson argues that his four convictions for using a child in a sexual performance are redundant convictions because they involved the use of a child in a single sexual performance. While often discussed along with double jeopardy, a claim that convictions are redundant stems from the legislation itself and the conclusion that it was not the legislative intent to separately punish multiple acts that occur close in time and make up one course of criminal conduct. We have declared convictions redundant when the facts forming the basis for two crimes overlap,[4] when the statutory language indicates one rather than multiple criminal violations was contemplated,[5] and when legislative history shows that an am-

---

[4]*Jefferson v. State,* 95 Nev. 577, 599 P.2d 1043 (1979).

[5]*Ebeling v. State,* 120 Nev. 401, 404, 91 P.3d 599, 601 (2004).

biguous statute was intended to assess one punishment.[6] " 'When a defendant receives multiple convictions based on a single act, this court will reverse "redundant convictions that do not comport with legislative intent." ' "[7] After the facts are ascertained, an examination of whether multiple convictions are improperly redundant begins with an examination of the statute.[8]

NRS 200.710 states:

> 1. A person who knowingly uses, encourages, entices or permits a minor to simulate or engage in or assist others to simulate or engage in sexual conduct to produce a performance is guilty of a category A felony and shall be punished as provided in NRS 200.750.
>
> 2. A person who knowingly uses, encourages, entices, coerces or permits a minor to be the subject of a sexual portrayal in a performance is guilty of a category A felony and shall be punished as provided in NRS 200.750, regardless of whether the minor is aware that the sexual portrayal is part of a performance.

The clear import of both subsections is to criminalize the use of a child in a performance involving a sexual act or portrayal.

The threshold issue is whether Wilson committed a single act or four individual acts that are punishable as separate violations of NRS 200.710. The statute punishes a defendant for knowingly using, encouraging, or permitting a minor to simulate or engage in sexual conduct to produce a performance, or to be the subject of a sexual portrayal in a performance. As opposed to some statutes that make it a crime to produce child pornography[9] or to possess child pornography,[10] both subsections of NRS 200.710 focus on

---

[6]*Carter v. State*, 98 Nev. 331, 334-35, 647 P.2d 374, 376 (1982) (prohibiting the imposition of multiple sentence enhancements pursuant to two different statutes and noting that " '[w]here the legislative intent of a criminal statute is ambiguous, the statute must be strictly construed against imposition of a penalty for which it does not provide clear notice").

[7]*Ebeling*, 120 Nev. at 404, 91 P.3d at 601 (quoting *State v. Koseck*, 113 Nev. 477, 479, 936 P.2d 836, 837 (1997) (quoting *Albitre v. State*, 103 Nev. 281, 283, 738 P.2d 1307, 1309 (1987))).

[8]*Mangarella v. State*, 117 Nev. 130, 133, 17 P.3d 989, 991 (2001) ("Statutes should be given their plain meaning and 'must be construed as a whole and not be read in a way that would render words or phrases superfluous or make a provision nugatory.' " (quoting *Charlie Brown Constr. Co. v. Boulder City*, 106 Nev. 497, 502, 797 P.2d 946, 949 (1990), *overruled on other grounds by Calloway v. City of Reno*, 116 Nev. 250, 993 P.2d 1259 (2000))).

[9]NRS 200.725.

[10]NRS 200.730.

the use of a minor in the performance of a sexual act or sexual portrayal. The performance can be done in any way—in a play, a dance or other visual presentation, or by film, photograph, computer-generated image or electronic representation.[11] But the crux of the prohibited conduct is the use of a minor in a sexual performance and not how the performance is otherwise recorded or documented.

Wilson argues that there was but one instance where he took four pictures of a minor's performance in various stages of undress. To prove the point, Wilson analogizes his four pictures to the making of a motion picture film, which, under the State's interpretation of the statute would amount to 24 separate violations of the statute per second of film. As Wilson points out, this would be the equivalent of 1440 violations of NRS 200.710 per minute of film. This would obviously be an absurd result, and whenever possible, we construe statutory language to avoid an absurd or unreasonable result.[12] Had Wilson made a film of the minor instead of taking photographs, he would have committed only a single violation and be subject to one punishment. The State admitted during oral argument that this would be the case if Wilson used film. The two disparate results between the use of film and photographs demonstrates to us that the focus of the crime must be on the performance and not on the way it is documented.

The State points to the definition of performance that is contained in the child pornography statutes. The word "performance" is defined as "any play, film, photograph, computer-generated image, electronic representation, dance or other visual presentation."[13] This definition of a performance is broad and covers various types of performances that can be considered sexual in nature as well as how those performances are recorded. But notwithstanding this broad definition, it is the use of a child in a sexual performance that is prohibited under NRS 200.710, and that performance can be of any type and documented in any manner.

In addition to the statutory language, Wilson directs our attention to our recent decision in *Crowley v. State*[14] and asserts that his act of photographing the victim should be treated as one event. In *Crowley,* the defendant rubbed the victim's underwear before pulling down his pants and performing fellatio on him.[15] We reasoned that because the act of rubbing the victim outside of his

---

[11]NRS 200.700(1).

[12]*Speer v. State,* 116 Nev. 677, 679, 5 P.3d 1063, 1064 (2000).

[13]NRS 200.700(1).

[14]120 Nev. 30, 83 P.3d 282 (2004).

[15]*Id.* at 34, 83 P.3d at 285.

pants was a prelude to the other acts that followed, the conduct was incidental to the sexual assault and should be treated as one episode.[16] In the case at bar, the four pictures were taken in a short period of time with Wilson pausing only to reposition the child. The facts and holding of *Crowley* are very similar to this case.

The purpose of Nevada's child pornography statutes is to protect children from the harms of sexual exploitation and prevent the distribution of child pornography.[17] As such, the intent of the Legislature in passing NRS 200.700 to 200.760, inclusive, was to criminalize the use of children in the production of child pornography, not to punish a defendant for multiple counts of production dictated by the number of images taken of one child, on one day, all at the same time. If the Legislature intended this statute to punish a party for every individual photograph produced of a sexual performance, it certainly could have effectuated that intent in the statute. Therefore, we conclude that the facts of this case demonstrate a single violation of NRS 200.710, not multiple acts in violation of the law.

Because of the language of the statute that focuses on the use of a minor in a sexual performance and our recent decision in *Crowley,* we reverse three of Wilson's four convictions for the use of a child as the subject in the performance of a sexual portrayal or act. Given this conclusion, it is unnecessary to determine whether the multiple convictions for the use of a minor in a sexual performance violate the Due Process Clause of either the Nevada or United States Constitution.

*Double Jeopardy Clause*

Wilson next argues that his conviction on four counts of possession of child pornography under NRS 200.730 violates double jeopardy because those counts are lesser-included offenses of the production charges.

Nevada uses the *Blockburger*[18] test to determine whether multiple convictions arising from a single incident are permissible, or to the contrary, if the charges amount to a lesser-included offense that is barred by double jeopardy.[19] " ' "Under this test, "if the elements

---

[16]*Id.* at 34, 83 P.3d at 285-86.

[17]*State v. Dist. Ct. (Epperson),* 120 Nev. 254, 263, 89 P.3d 663, 668 (2004).

[18]*Blockburger v. United States,* 284 U.S. 299 (1932).

[19]*E.g., Salazar v. State,* 119 Nev. 224, 227, 70 P.3d 749, 751 (2003).

of one offense are entirely included within the elements of a second offense, the first offense is a lesser included offense and the Double Jeopardy Clause prohibits a conviction for both offenses.'" '"[20] The test ultimately resolves itself on whether the provisions of each of the different statutes require the proof of a fact that the other does not.[21]

The two statutes involved are NRS 200.710 and NRS 200.730. Comparing the two, NRS 200.710 requires that a person knowingly use, encourage, entice, coerce or permit a minor to engage in or be the subject of a sexual portrayal in a performance. NRS 200.730 requires that a person "knowingly and willfully" possess a "film, photograph or other visual presentation depicting a person under the age of 16 years as the subject of a sexual portrayal or engaging in or simulating . . . sexual conduct."

We conclude that the production charge required only that Wilson utilize a minor in the performance of a sexual portrayal, whereas the possession statute requires that he maintain possession of the photograph memorializing the pornographic performance. The production crime was completed when Wilson had the minor pose in sexually explicit positions. He then photographed the activity so that he could memorialize it for later review. The fact that he maintained possession, until he was arrested days later on an unrelated offense, amounts to the commission of a separate and distinct crime from the initial production of the photographs.

The crime of possession of child pornography is not a lesser-included offense to the production of child pornography as defined by Nevada law. Consequently, NRS 200.710 and NRS 200.730 are not mutually exclusive and, as this case aptly demonstrates, a violation of each requires proof of an element that the other does not. Therefore, we affirm Wilson's four convictions for the possession of child pornography.

*District court's refusal to permit Wilson possession of the photographs*

The State charged Wilson with the production and possession of child pornography. The actual pornographic photographs taken of the minor victim were material pieces of evidence against Wilson at trial. Wilson argues that the district court committed reversible error when it ordered that Wilson's standby counsel turn over the

---

[20]*Id.* (quoting *Williams v. State,* 118 Nev. 536, 548, 50 P.3d 1116, 1124 (2002) (quoting *Barton v. State,* 117 Nev. 686, 692, 30 P.3d 1103, 1107 (2001))).

[21]*Blockburger,* 284 U.S. at 304.

copies of the pictures that a previous judge permitted him to have in preparation of his defense.

Wilson argues on appeal that the district court's denial of possession of the pictures violated due process and his Sixth Amendment right to the effective assistance of counsel, citing *State v. District Court (Epperson).*[22] In *Epperson,* the State sought to prevent the defense from obtaining a copy of a pornographic video that was part of the discoverable evidence.[23] The State refused to copy the video for defense counsel to review with experts in preparation of a defense, arguing that Nevada's child pornography statutes, NRS 200.710 to 200.730, prohibit the reproduction of child pornography, but the State provided defense counsel access to view the video at its office.[24] This court held that "[b]ecause nothing in NRS 174.235 or NRS 200.710 to 200.735 precludes child pornography from being copied for the purpose of defending criminal charges," the *Epperson* defendants had a right to possess a copy of the videotape to prepare for trial, provided that certain restrictions were met.[25]

We conclude that this case is distinguishable from *Epperson.* In *Epperson,* the defense was able to show that it was unable to adequately prepare for trial because it was denied physical possession of the evidence before trial. Here, Wilson had access to and possession of the evidence through standby counsel right up to the start of trial. He was able to have it examined by experts in an effort to prepare for trial had he wished to do so. The district court ordered the evidence turned over only after standby counsel represented to the court that it was no longer needed to prepare Wilson's defense. The fact that it was turned over on the first day of trial, to remain with the clerk or entered into evidence as the case may warrant, did not prevent Wilson's access to the evidence provided he could demonstrate a further need for it.

Furthermore, Wilson makes no argument as to how or why access, instead of possession, in any way prejudiced his ability to mount an adequate defense. Wilson does argue that Judge Leavitt abused her discretion and violated EDCR 7.12. EDCR 7.12 provides that once an application or writ for an order has been made to a judge "and is pending or has been denied" by that judge, the same application or motion cannot again be made to the same or a different judge. Contrary to Wilson's argument, the plain language of the rule indicates that it applies to a motion or order that

---

[22]120 Nev. 254, 89 P.3d 663.

[23]*Id.* at 258-59, 89 P.3d at 665-68.

[24]*Id.*

[25]*Id.* at 262, 89 P.3d at 668.

is pending or denied, not to the modification of an outstanding order when the need supporting its issuance is no longer contested. Wilson bases his argument on the overriding public policy of preventing forum shopping. We conclude that Wilson's argument is unpersuasive, and the district court did not violate the rule or abuse its discretion.

## Confrontation Clause

Wilson contends that his Sixth Amendment right to confront the witnesses against him was violated when the prosecution rearranged the courtroom by moving a podium so that M.T., a minor child, had her back to the defendant while testifying. Wilson argues that this action was made more prejudicial because it was done in full view of the jurors, tainting their impression of the witness's testimony. He also believes that this was not harmless error because without this witness's testimony, the State lacked sufficient evidence to prove beyond a reasonable doubt that he took the pornographic photographs.

The Sixth Amendment to the United States Constitution provides every criminal defendant with the right to confront his or her accuser.[26] In *Coy v. Iowa,* the United States Supreme Court held that the use of a screen to block the defendant's view of a witness on the stand violates the Sixth Amendment.[27] In that case, a specially designed screen was used to block the witness's view of the defendant while allowing the defendant to hear and "dimly to perceive" the witnesses.[28] The Supreme Court opined that "[i]t is difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter.'"[29]

This court addressed the constitutional right to a face-to-face confrontation in *Smith v. State.*[30] In that case, the prosecutor positioned himself between the child victim and the defendant so that the witness could not see the defendant during her direct testimony and vice versa.[31] Relying on *Coy,* this court held that even though Smith had the opportunity to cross-examine the child victim face-to-face, he could not do so effectively because when "a child witness is permitted to testify on direct examination 'behind the defendant's back,' so to speak, and does so credibly, the damage has already been done; it would be very difficult to impeach or dis-

---

[26]U.S. Const. amend. VI; *see also Smith v. State,* 111 Nev. 499, 502, 894 P.2d 974, 975 (1995).

[27]487 U.S. 1012, 1015-22 (1988).

[28]*Id.* at 1015, 1020.

[29]*Id.* at 1020.

[30]111 Nev. 499, 894 P.2d 974.

[31]*Id.* at 501, 894 P.2d at 975.

credit that testimony on cross-examination.''[32] As the majority pointed out in *Smith,* cross-examination of the child victim by the defense may not provide an adequate cure because defense counsel is likely to alienate the jury against the defendant.[33]

In the present case, the prosecutor rearranged the courtroom layout to reposition the minor witness in an attempt to have her testify with her back to the defendant. Wilson did not object at the time, but he later moved for a mistrial at the end of his case in chief. The State suggested that its motive for moving the podium was to protect M.T. and argued that the arrangement did not violate Wilson's rights:

> Whether I question [her] from my table, from across the room, what have you, I think is irrelevant to whether or not he had an opportunity to confront his [sic] witness, which he did. She testified. He had the opportunity to ask her questions. That's meeting his right for confrontation. So I don't believe that that is a basis for a mistrial, either.

Recognizing the failings of this argument, the State on appeal attempts to distinguish *Coy* and *Smith,* arguing that in each case there was a physical barrier or blockade between the witness and the defendant.

While the State's argument misses the mark in relation to this court's Confrontation Clause analysis, Wilson failed to establish exactly where the prosecution positioned the podium and how much of his view was obstructed. Wilson did not make a contemporaneous objection but waited until the end of his case to make a verbal motion for a mistrial. The only evidence in the record is Wilson's own statements made when he argued his motion for a mistrial and a hand-drawn rendering of the courtroom submitted as part of his appendix on appeal. There is no testimony or affidavit in the record to establish how the prosecutor's action blocked Wilson's view of the child during her testimony or confirming the layout as drawn by him. In the absence of substantive proof, we are unable to conclude that the prosecutor's actions violated the Confrontation Clause.

We are also unpersuaded by Wilson's claim that but for this alleged Confrontation Clause violation that tainted the child's testimony, the State would not have been able to establish that he took the photographs. The record contains other evidence establishing that Wilson took the photographs. Wilson's sister, Virgie Barerra,

---

[32]*Id.* at 502-03, 894 P.2d at 976.

[33]*Id.*

testified that Wilson called her shortly after his arrest and asked her to remove some pictures from his Ford Bronco. According to Barerra's testimony, Wilson suggested the pictures were "really, really gross" and that she should destroy them and not look at them. The evidence at trial indicated that Wilson, while running an errand with the victim, stopped at a Wal-Mart store to purchase her some new clothes, and according to the store receipt, also purchased an instant camera and film. Wilson admitted to buying the camera when interviewed by the police. A Polaroid camera was discovered in the center console of his Bronco. Both Barerra and her husband testified that during separate conversations with each of them, Wilson admitted that he took the photographs and that he needed help. Because evidence independent of the child's testimony established that Wilson took the photographs, we conclude that any Confrontation Clause violation was harmless beyond a reasonable doubt.[34]

### Interstate Agreement on Detainers (IAD)

Wilson argues that the district court committed reversible error when it denied his motion to dismiss for failure to commence trial within the 120-day period required by the IAD. Wilson contends that his trial did not commence until 184 days after his arrival in the CCDC, a violation of Article IV(c) of the IAD.

The IAD is an interstate compact approved by the United States Congress to which Nevada is a party.[35] The IAD is codified in Nevada law at NRS 178.620. The IAD, among other things, specifies the procedures by which a prisoner may request speedy disposition of the charges pending against him in a jurisdiction other than where he is incarcerated.[36] Article IV of the IAD requires that when, at the State's request, a defendant is brought from another jurisdiction to face charges pending against him, the receiving state must try him within 120 days of his arrival, unless good cause is shown for a delay.[37] The failure to commence trial within the

---

[34]See Franco v. State, 109 Nev. 1229, 1237, 866 P.2d 247, 252 (1993) (stating that Confrontation Clause errors are subject to harmless error review).

[35]Prince v. State, 118 Nev. 634, 637, 642, 55 P.3d 947, 949, 952 (2002) (holding that the IAD does not apply to a defendant awaiting sentencing).

[36]NRS 178.620, Art. I.

[37]NRS 178.620, Article IV provides in pertinent part:

> (a) The appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party state made available . . . upon presentation of a written request for temporary custody or availability to the appropriate authorities of the state in which the prisoner is incarcerated . . . .
> . . . .

120-day period results in dismissal of the charges with prejudice.[38] However, this 120-day requirement is not absolute, and the time period is tolled whenever a defendant is either unable to stand trial,[39] or when the delay is occasioned by the defendant's own actions.[40] Under NRS 178.405, whenever ''doubt arises as to the competence of the defendant, the court shall suspend the trial . . . until the question of competence is determined.''

The federal government transferred Wilson to the CCDC on January 20, 2003, and his trial commenced on July 23, 2003—a total span of 184 days. The issue on appeal is whether the State met the 120-day requirement because the time period was tolled by the necessary inquiry into Wilson's competency to stand trial. On March 17, 2003, the public defender who was initially assigned to represent Wilson raised concerns regarding Wilson's competency to stand trial. He presented the court with a psychological evaluation that indicated Wilson was incompetent and unable to aid in his defense. On March 26, 2003, the judge was presented with a second report, also demonstrating that Wilson was not competent to stand trial.

Wilson argues that the 120-day period was not tolled until March 31, 2003, the date the commitment order was signed and filed.[41] Wilson further contends that because the judge expressed

---

> (c) In respect of any proceeding made possible by this Article, trial shall be commenced within one hundred twenty days of the arrival of the prisoner in the receiving state, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

[38]NRS 178.620, Article V(c) provides, in pertinent part:

> [I]n the event that an action on the indictment, information or complaint on the basis of which the detainer has been lodged is not brought to trial within the period provided in Article III or Article IV hereof, the appropriate court of the jurisdiction where the indictment, information or complaint has been pending shall enter an order dismissing the same with prejudice, and any detainer based thereon shall cease to be of any force or effect.

[39]*Snyder v. State,* 103 Nev. 275, 277, 738 P.2d 1303, 1305 (1987).

[40]*E.g., Diaz v. State,* 118 Nev. 451, 454, 50 P.3d 166, 167-68 (2002) (citing *United States v. Scheer,* 729 F.2d 164, 168 (2d Cir. 1984)); *see also Snyder v. Sumner,* 960 F.2d 1448, 1454 (9th Cir. 1992) (''Because Snyder himself requested the continuance, he cannot dispute that this first delay is to be attributed to him. By requesting the continuance, he waived his right to a speedy trial.''). *But see Diaz,* 118 Nev. at 456, 50 P.3d at 169 (ROSE, J., dissenting) (''I would not recognize a tolling of the [IAD] limit unless it is demonstrated that the defendant has engaged in conduct intended to cause a delay in bringing the case to trial.'').

[41]Wilson cites *State, Division Child & Family Services v. District Court,* 120 Nev. 445, 92 P.3d 1239 (2004).

doubts as to the validity of the psychological reports, the time period was not tolled while the court conducted the hearing and further evaluation that was required under Nevada law. We conclude that Wilson's arguments are unpersuasive. Read together, these statutes require that at the point in time when a doubt is raised as to a defendant's competency to stand trial, and where good cause is shown in open court, the 120-day period is tolled until the court can ascertain the defendant's mental competency. Importantly, the district court ultimately reviewed the reports of four psychologists, three of whom believed Wilson was not competent to stand trial and a fourth who disagreed with that assessment.

On June 4, 2003, the district court, finding the opinion of the fourth doctor more persuasive, adjudged Wilson competent to stand trial.[42] Consequently, the time period was tolled from the date Wilson's competency was first challenged, March 17, 2003, until he was deemed competent on June 4, 2003, a span of 79 days. Therefore, Wilson was brought to trial in 105 days, well within the 120-day period. As a result, we conclude that the trial court did not err in denying Wilson's motion to dismiss for the State's failure to commence trial within the time required by the IAD.

In his reply brief, Wilson raises an unrelated argument that the delay in bringing him to trial resulted in prejudice because the two doctors who treated him while he was in federal custody either died or retired and thus were unavailable to appear at the hearing on his motion to suppress his confession. Wilson argues that their testimony would prove that his confession was not freely and voluntarily given. In regard to the violation of his IAD rights, this line of reasoning is irrelevant to the issues presented on appeal. Moreover, we conclude that the unavailability of these two particular doctors did not prevent Wilson from presenting at the suppression hearing evidence or testimony pertaining to the voluntariness of his confession. We therefore conclude that no prejudice is demonstrated on these facts.

## Failure to compel attendance of out-of-state witnesses

Wilson next argues that the district court committed reversible error and violated his due process rights when it failed to compel two out-of-state witnesses to testify. Wilson claims the witnesses would have testified that they were with Wilson at all times during the dates listed on the indictment. Wilson argues that because the district court had the authority to compel the testimony of out-of-state witnesses under NRS 174.425 and did not do so, he was denied due process and his conviction should be reversed.

---

[42]Wilson does not challenge this finding by the district court on appeal.

As this court has often noted, the Sixth Amendment provides a criminal defendant with the right to compel the production of witnesses to testify on his or her behalf.[43] However, jurisdictional limitations inherently hinder a state court's ability to compel out-of-state witnesses because the State of Nevada cannot enforce a subpoena against a citizen of another state unless that party is present within this state. To ensure the attendance of out-of-state witnesses, the Legislature enacted NRS 174.395 to 174.445, known as the Uniform Act To Secure the Attendance of Witnesses From Without a State in Criminal Proceedings.[44] However, the right to produce an out-of-state witness is not absolute.[45] Under the Act, a trial court has discretion to issue a certificate summoning the attendance of an out-of-state witness based on a determination that the witness is material to the party's case.[46] As a result, we review a trial court's refusal to issue a certificate for an abuse of discretion.[47]

This court has noted that it is reasonable for the trial court to refuse to issue a certificate to compel an out-of-state witness's attendance under certain circumstances.[48] In addition, we have concluded that it is unreasonable for the trial court to refuse to compel a witness merely because it doubts the veracity of his or her testi-

---

[43]*E.g., Palmer v. State,* 112 Nev. 763, 766, 920 P.2d 112, 113 (1996); *Bell v. State,* 110 Nev. 1210, 1213, 885 P.2d 1311, 1313 (1994) (citing *State v. Fouquette,* 67 Nev. 505, 221 P.2d 404 (1950)); *see also* U.S. Const. amend. VI.

[44]NRS 174.425(1) provides:

If a person in any state . . . is a material witness in a prosecution pending in a court of record in this state, or in a grand jury investigation which has commenced or is about to commence, a judge of such a court may issue a certificate under the seal of the court stating these facts and specifying the number of days the witness will be required. The certificate may include a recommendation that the witness be taken into immediate custody and delivered to an officer of this state to ensure his attendance in this state. This certificate must be presented to a judge of a court of record in the county in which the witness is found.

[45]*Fouquette,* 67 Nev. at 516, 221 P.2d at 410.

[46]*Id.*

[47]*Bell,* 110 Nev. at 1213-14, 885 P.2d at 1313-14; *see also Palmer,* 112 Nev. at 766, 920 P.2d at 113-14.

[48]*See Palmer,* 112 Nev. at 767-68, 920 P.2d at 114 (noting that when there is a credible showing that the witness intends to invoke the Fifth Amendment privilege not to testify, the court may refuse to issue a certificate, and distinguishing the facts of *Palmer* from *Bell* where the trial court merely suggested the witness might invoke the Fifth Amendment, whereas in *Palmer* the witness indicated to the court that he would).

mony.[49] However, where there are adequate substitutions for the witness's testimony, it is reasonable for a trial court to decline to compel the attendance of an out-of-state witness.[50]

Initially, it is important to note that the district court in this case did indeed err with regard to the law. The trial court failed to recognize that it could compel out-of-state witnesses to appear. Wilson raised the issue before the district court on multiple occasions. When he raised the issue at trial, the following exchange occurred:

> MR. WILSON: There is no compulsory process at all to bring a witness and I don't have a fair trial?
>
> THE COURT: I cannot.
>
> MR. WILSON: They're an alibi witness.
>
> THE COURT: I'm going to tell you again, I don't know many other ways I can explain this to you. I don't have subpoena power. I cannot as a judge in Nevada order a California resident to appear in this court.
>
> They do not have to comply with my subpoena. I have no jurisdiction in California. And I explained this to you last week and explained to you that they were your family members and that you need to talk to them and get them to voluntarily appear.

Following that exchange, the State made a lengthy showing for the record as to why the witnesses were not alibi witnesses and that there was inadequate notice before the trial court as to the witnesses' status as such.

Wilson argues on appeal that he explained to the district court the materiality of the witnesses. However, the trial record cited by Wilson is for the sentencing hearing, which occurred on October 10, 2003. At that time, Wilson argued that it was crucial to his case because the two witnesses he intended to call would testify that they were with him during a portion of the time the State accused him of committing the acts in question.

We conclude that it was legally incorrect for the district court to represent to Wilson that there was no procedure under Nevada law for a criminal defendant to compel the appearance of an out-of-

---

[49]*Bell,* 110 Nev. at 1214, 885 P.2d at 1314 (noting that "[o]n the facts presented, it was too speculative to say that because [the witness] might tell conflicting stories, his testimony was immaterial to Bell's defense").

[50]*Id.* at 1215, 885 P.2d at 1314 ("Other jurisdictions have determined that given the availability of in-state witnesses who can supply the needed testimony, it is not error for a trial court to deny a party's request to compel the presence of an out-of-state witness.") (citing *Com. v. Appleby,* 450 N.E.2d 1070 (Mass. 1983); *Sanchez v. State,* 691 S.W.2d 795 (Tex. 1985)).

state witness. The record indicates that Wilson raised the issue numerous times. The court went so far as to order his court-appointed investigator and standby counsel to do whatever was necessary to contact these witnesses for the defense. Although the record is unclear as to what steps the parties involved used to contact Wilson's relatives, they apparently were unsuccessful at procuring their attendance at his trial. It is surprising to us that the district attorney did not inform the district court of its obvious error, nor did standby counsel inform Wilson.

Although the district court made a legal error, the denial of Wilson's request to subpoena out-of-state witnesses was justified because Wilson failed to show that the witnesses were material to his case and how their absence prejudiced the defense. Wilson did not make an offer of proof as to what the two out-of-state witnesses would have said in support of his case. In Wilson's motion for a mistrial, he stated that these two witnesses would have shown that he was with them during several dates in question. However, he did not represent that either of the witnesses would have testified that they were with him on November 15, 2001, the day the pictures were taken. Therefore, we conclude that Wilson has not shown how the testimony of the two witnesses would have assisted him, and the district court did not abuse its discretion in denying Wilson the requested relief.

### Proper notice of the charges in the indictment

Wilson's final contention is that defects in the indictment violated his due process rights by failing to provide him with adequate notice and that the defects prejudiced him to such an extent that he was unable to mount a proper defense. Wilson points to the language of the indictment wherein the State accused him of crimes ''committed at and within the County of Clark, State of Nevada, *on or 10th day of November,* 2001, [sic] and the 18th day of November 2001.'' (Emphasis added.)

Nevada law requires that an indictment must contain ''a plain, concise and definite written statement of the essential facts constituting the offense charged.''[51] However, this court has noted that there is no requirement that the State allege exact dates unless the situation is one in which time is an element of the crime charged.[52] Instead,

---

[51]NRS 173.075(1).

[52]*Cunningham v. State,* 100 Nev. 396, 400, 683 P.2d 500, 502 (1984) (citing *Brown v. State,* 81 Nev. 397, 404 P.2d 428 (1965); *Martinez v. State,* 77 Nev. 184, 360 P.2d 836 (1961), and noting that time is not an element for

the State may provide approximate dates on which it is believed that the crime occurred.[53] In *Cunningham v. State,* this court held that it is permissible for the State to give a time frame for an offense instead of a specific date, provided that the dates listed are sufficient to place the defendant on notice of the charges.[54] "Otherwise, convictions for criminal misfeasance would only be valid when the State correctly guesses the [exact] date of an offense."[55] This court has made it clear, however, that the State may not fail to allege any date whatsoever in an indictment or information, for such a failure would deprive the defendant of adequate notice of the crime charged such that he would be incapable of preparing an adequate defense, which is the intended purpose behind the notice requirement.[56]

In the present case, Wilson argues on appeal that he believed that the State charged him with committing the crimes on the specific dates of November 10 and 18, not a span of dates from the 10th to the 18th. Wilson states that because the indictment said "on or 10th . . . and the 18th," he believed that if he could show at trial that he did not commit the crimes charged on the two dates noted, "[t]his would be a specific defense." In support, Wilson notes that at trial he was able to show that he was incarcerated as of November 17 and could not have committed the crimes on that date. In addition, Wilson urges that his defense strategy revolved around using the testimony of the two out-of-state witnesses to show that he could not have committed the crimes on the day of November 10 because the witnesses were with him at all times that day. In fact, the State concedes on appeal that the indictment was in error but argues that it was merely "a clerical error" and was not prejudicial because the defendant was aware at trial that the charges involved a span of dates between November 10 and November 18, 2001.

While Wilson's argument is technically correct in that the indictment as written is incorrect, he misrepresents on appeal the impact of that error on his ability to mount a defense at trial. During his opening statement Wilson said, "I will show you a receipt and it

---

crimes of a sexually deviant nature and that crimes involving the sexual abuse of a child victim often prove especially difficult cases to pin down an exact time frame due to the age of the child and the child's reluctance to testify).

[53]*Id.*

[54]*Id.*

[55]*Koerschner v. State,* 116 Nev. 1111, 1119, 13 P.3d 451, 456 (2000).

[56]*Cunningham,* 100 Nev. at 400, 683 P.2d at 502; *see also Koerschner,* 116 Nev. at 1119, 13 P.3d at 457 (citing *Cunningham* with approval and refusing to find error when the State failed to allege specific dates for two of three charges of sexual assault).

says that on November 15, 2001, at a certain time a Polaroid camera was purchased from a Wal-Mart. . . . Then I'll show you statements that this person testified under oath very clearly and specifically, No, it wasn't him.'' This demonstrates that Wilson was aware the State intended to present evidence of his actions on the dates between the dates listed on the indictment, and the State's theory of the crime was that it occurred on that date. In addition, other representations Wilson made to the court indicate that he was aware that the State was accusing him of crimes between the dates listed. For example, while attempting to demonstrate the materiality of the aforementioned out-of-state witnesses Wilson stated, ''They charged me with specific dates, 10th to the 18th. Do you understand? That's only a seven–day period. Five of them days, Marie and Jessica was with me 24 hours a day.'' While the State should make every effort to set forth accurate facts in the charging document, we conclude that the error in the indictment in this case was not so egregious that it deprived Wilson of adequate notice of the charges against him or prejudiced him to such an extent that he was unable to adequately defend against the State's charges.

## CONCLUSION

We conclude that Wilson's conviction on four counts of producing child pornography under NRS 200.710, which arose out of a single episode, are redundant and therefore reverse the conviction for three of those counts. We further conclude that possession of child pornography under NRS 200.730 is not a lesser-included offense of the production of child pornography under NRS 200.710 and therefore Wilson's four convictions for possession of child pornography do not violate the Double Jeopardy Clause. We conclude that Wilson's remaining arguments on appeal lack merit. Accordingly, we reverse three of Wilson's four convictions for the production of child pornography, we affirm the other convictions, and we remand this case to the district court for resentencing in accordance with this opinion.